Rita MACHAKOS, Plaintiff,

v.

Edwin MEESE, Attorney General of the United States, In his official capacity, and Department of Justice, Defendants.

Civ. A. No. 83–2610.

United States District Court, District of Columbia.

Nov. 3, 1986.

Conrad D. Philos, Vienna, Va., Thomas A. Mauro, Malley, Scott, Koffman & Heston, Washington, D.C., for plaintiff.

Stuart H. Newberger, Asst. U.S. Atty., Washington, D.C., for defendants.

## OPINION

JUNE L. GREEN, District Judge.

This action is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and the Age Discrimination in Employment Act of 1974, 29 U.S.C. § 633a ("ADEA").[1] Plaintiff

---

1. Plaintiff also asserted claims under the Equal Pay Act, 29 U.S.C. § 206(d)(1) and the Privacy Act of 1974, 5 U.S.C. § 552a. Plaintiff requested a nonsuit as to her Equal Pay Act claim, and she produced insufficient evidence to support her Privacy Act claim. *See* Tr. 449–455; Edison v. Department of the Army, 672 F.2d 840, 845 (11th Cir.1982) (Plaintiff failed to demonstrate

Rita Machakos, a white female, born in February 1924, seeks relief for alleged discrimination in employment on the basis of her age, race, sex,[2] and retaliation for having raised these allegations. A trial to the Court was followed by extensive post-trial briefing.

Ms. Machakos joined the Civil Rights Division ("CRD") of the United States Department of Justice (the "Department") in 1976. Specifically, Ms. Machakos alleges employment discrimination in her efforts to gain promotion to several Paralegal Specialist positions in the CRD during the period 1977 through 1984. Ms. Machakos' allegations concerning events in 1977 and early 1978 were the subject of administrative proceedings that culminated in a December 13, 1982, final decision by the Equal Employment Opportunity Commission ("EEOC"), holding that there had been no discrimination of any kind.[3]

This case presents the unusual instance of reverse-discrimination. The Court, ever mindful of the peculiarity of the situation in which discrimination against the majority is alleged, has endeavored to weigh carefully the testimony and examine closely the evidence. By a preponderance of the evidence, the Court finds for plaintiff on her Title VII claim, but finds in favor of defendant on the ADEA claim.

Discussion of the merits of plaintiff's claims requires some knowledge of the setting in which those claims arose. Before proceeding with the findings of fact, the Court will outline the nature and usual working of Department promotion policies as regards paralegal positions. The Court will further sketch a brief history of Ms. Machakos' past employment in an effort to add some perspective.

*The Department's Employment/Promotion Policies*

Promotion requests come normally in the form of an SF–52, Request for Personnel Action, generated by a manager or supervisor. The action to be taken by the Personnel Specialist upon receipt of an SF–52 will depend upon: (1) the action requested by the requesting manager or supervisor; and (2) the Department's policies, directives and procedures, as well as Office of Personnel Management ("OPM") regulations and Federal Personnel Manual ("FPM") instructions governing the proposed personnel action.

In the case of a promotion without competition, the Personnel Specialist reviews the candidate to determine eligibility and qualification for promotion. This involves a review of certain qualification standards and a determination as to whether the proposed promotion action falls within one of the exceptions to promotion through competitive procedures.

When it is determined that a candidate must compete for the higher level position, the Personnel Specialist will announce the vacancy by issuing a written notice. The Personnel Specialist will research the standard qualifications deemed necessary for the position and identify these in the vacancy announcement. Further, the Personnel Specialist will generally confer with the organization's supervisor/manager for purposes of developing criteria against which applicants will be evaluated once all the applications are received. The candidates are then narrowed down to a group determined to be "best qualified" by reference to the standards found in Offices, Boards and Divisions Order 1335.1 (Oct. 16, 1984).

causal relationship between allegedly erroneous record and an adverse determination based on that record). Furthermore, plaintiff did not address the Privacy Act claim in her post-trial briefing, which leads the Court to assume that this claim has been dropped. Accordingly, these claims are dismissed.

2. The Court dismissed the claim of sex discrimination at the close of plaintiff's case, there being insufficient evidence for a *prima facie* showing.

3. Defendant contended that the September 1983 filing of the original complaint initiating this suit was out of time because it was not filed within 30 days of the EEOC's final decision. Plaintiff's request that the EEOC reopen her case acted to toll the 30–day statutory deadline. *See* Nordell v. Heckler, 749 F.2d 47 (D.C.Cir. 1984).

*See* 28 C.F.R., Subpart O, § 0.77. Ultimately, a selection is made from among the candidates identified as "best qualified" by the supervisor/manager who initiated the SF–52, Request for Personnel Action.

The "detailing" of employees into sections of the CRD, other offices, boards, and divisions of the Department, are based on the following:

a) a lack or shortage of assigned positions and/or work hours in the gaining organization;

b) a delay in filling or inability to fill vacant positions in the gaining organization;

c) a projected temporary excess workload in the gaining organization;

d) a projected temporary lull in the losing organization;

e) special skills of an employee required by the gaining organization;

f) a combination of the above five items; and

g) a management determination that the detailing of an employee would be in the best interest of the government.

It is common for employees to be aware of the development of the situations described above. These employees frequently meet with the section chief and/or unit supervisors in the gaining organization to negotiate their being detailed to the gaining section, division, or agency. In addition, section chiefs negotiate with each other in seeking to obtain or release employees on details.

"Career ladder" positions in the CRD are positions with inherent potential for promotion. When a position is filled at an entry grade level which is one or more grades lower than the highest grade established for the position, a career promotion may occur. Entry into career ladder positions can occur through demotion to a lower grade, lateral reassignment at the same grade, promotion to a higher grade, or by way of appointment from a civil service register. Entry into a career ladder or progression within a career ladder is not contingent on having served in specified lower level positions, but rather is dependent on the entrant's demonstrating the requisite qualifications specified in OPM Handbook X–118. Defendants' Exhibit 2.

As to length of time required for promotion, reference is made to the OPM Handbook X–118 qualifications standards for Paralegal Specialist, GS–950 series, and Equal Employment Opportunity ("EEO") Specialist, GS–160 series (positions which plaintiff sought). Both sets of standards establish the number of years/months of general and specialized experience required for eligibility at particular grade levels. These standards also provide for substitution of formal education for experience (or combinations of both) for qualifications eligibility purposes. Generally speaking, the standards require at least one year of experience at the preceding grade level, or equivalent, before one is considered qualified for advancement.

OPM regulations found in 5 C.F.R. § 300.602 establish "time-in-grade" requirements for advancement to higher level positions in the competitive service. Skills for advancement need not be acquired on the job. Depending upon the skills required for a given position or a particular type of work, skills may be acquired on the job, in other federal jobs, by way of specialized training, or by way of private sector employment.

*Plaintiff's Employment History*

Rita Machakos entered the Federal Service in 1943 as a GS–2 (temporary) Legal Stenographer with the Office of Price Administration. She served thereafter as a permanent employee of the Department of the Navy with successive duties as an inventory clerk, secretary, and personnel specialist in grade GS–3.

Ms. Machakos then worked for the Department of the Air Force and rose to a GS–6 administrative position (with secretarial duties) by 1960. Ms. Machakos left the Air Force and worked for a few months as an office manager for the Mitre Corporation. From 1961–1969, she served on the staff of Congressman John Anderson. She worked as an aide and case worker on

constituent complaints, principally those involving veterans benefits and social security.

In 1969, Ms. Machakos left her position with Congressman Anderson to serve as an office manager for Congressman Horton of New York. She left that office in 1971 to work for the director of a Senate Select Committee on Equal Education Opportunity.

When that committee was disbanded in 1973, Ms. Machakos went on to work as an aide for Congresswoman Bella Abzug until 1975. She served with the Congresswoman as office manager and also supervised several paralegal interns. Subsequently, plaintiff worked in the private sector as a legal secretary.

## I. *Findings of Fact*

### A. *The Chronology*

Ms. Machakos was 52 years old when she began her employment with the Department of Justice in November 1976. Plaintiff was hired initially under a temporary appointment by the Department of Health, Education and Welfare and detailed to the Task Force on Sex Discrimination ("Task Force"). At the time the Department did not have any personnel "slots" for the Task Force.

The CRD's Executive Officer at the time, Harry Fair (white), told the Director of the Task Force, Francine Temko (white), that plaintiff would be hired as a GS–7, but when funding became available plaintiff would be promoted easily. Ms. Temko passed these assurances on to Ms. Machakos, who then accepted the temporary appointment at the GS–7, step 10 level.

After funding became available for the Task Force, Ms. Machakos was reinstated to a career ladder position of Secretary (Stenography), GS–0318–07, step 10, effective June 19, 1977. In July 1977, Ms. Stewart Oneglia (white) became the Task Force Director, succeeding Ms. Temko who had left the Task Force in March 1977.

On August 1, 1977, the Department issued vacancy announcements for the positions of Paralegal Specialist, GS–950–7/9 and GS–950–11, with the Task Force. By this time Ms. Machakos had made her interest in a paralegal position well known, and Ms. Oneglia had Ms. Machakos detailed to a paralegal position in July 1977.

Ms. Machakos intended apparently to apply for both Paralegal Specialist positions. She submitted a timely Personal Qualifications Statement ("SF–171"), but there was some confusion over which position Ms. Machakos was applying for (GS–7/9 or GS–11). Further confusion in considering plaintiff for these positions was occasioned when she had to revise her SF–171 to reflect more accurately her employment history.

As a result Ms. Machakos failed to make the referral list for the GS–11 position. In fact, the Department made no selection from the referral list as one GS–11 Paralegal Specialist, Brenda Sheppard (black), was reassigned to the Task Force earlier. This was a noncompetitive lateral transfer since Ms. Sheppard was already a GS–11. It must also be noted that the seven best qualified candidates for the GS–11 position all had experience, education, performance appraisals, or awards that caused them to be ranked higher than plaintiff. *See* Joint Exhibit 1, at 113, 250–310.

As to the GS–7/9 position, plaintiff was not ranked high enough to be among the best qualified candidates referred to the selecting official. *See* Joint Exhibit 1, at 113, 120–130. The delay occasioned by plaintiff's need to revise her SF–171 and the confusion as to which position Ms. Machakos was applying for (GS–7/9, GS–11, or both) were present here, as well.

Ms. Machakos' detail as a paralegal expired in September 1977. In her absence, the secretarial position which Ms. Machakos held prior to the detail had been filled by the Task Force Director, Ms. Oneglia. Ms. Machakos was uncertain as to what her duties were, and she made an informal complaint. A Supervisory Personnel Management Specialist reviewed her situation and on November 30, 1977, Ms. Oneglia met with Ms. Machakos to discuss the

employment options available to her. By a memorandum dated December 13, 1977, Ms. Machakos rejected Ms. Oneglia's offer to have her position reclassified. Joint Exhibit 1 at 6.

During this same period, Ms. Machakos contacted the Deputy Assistant Attorney General for the CRD, the Civil Service Commission, and the Department's Personnel Training Staff concerning her employment situation. Further, Ms. Machakos continued to express her disappointment in written and verbal form. At this point, Ms. Oneglia indicated that she felt Ms. Machakos' behavior was having a negative impact on personnel. Since Ms. Machakos was unable to return to her prior position and she rejected Ms. Oneglia's offer to reclassify her position, Ms. Machakos was transferred involuntarily on January 23, 1978, to a GS–7, legal technician position in the Correspondence Unit of the CRD.

After being removed from the Task Force, Ms. Machakos applied for a number of positions in different sections of the CRD. In November 1978, she applied under a vacancy announcement for a GS–950–5/7/9 Paralegal Specialist in the Federal Enforcement Section of the CRD. The successful candidate was Ms. Jane Robinson (black). Ms. Robinson was a secretary at the time of her selection.

In 1980, Ms. Machakos applied for a GS–7 paralegal position in the Special Litigation Section of the CRD. The candidate selected was Ms. Vonnie Ryan (black). In the summer of 1977, Ms. Ryan sat for the Competitive Clerk-Typist test. On arrival in the CRD in October 1977, she was detailed from the Administrative Section to the Special Litigation Section to provide reading services for a blind attorney there. Subsequently, she was assigned to work in the Correspondence Unit. In the spring of 1978, Ms. Ryan was transferred to the Special Litigation Section as a Clerk-Typist. In 1979, she was promoted to Legal Technician.

The SF–171's were reviewed by Ms. Joan Varley (white), the Supervisory Paralegal Specialist for the Special Litigation Section, and she recommended that Ms. Ryan be selected. Ms. M. Lynn Walker (black), then Chief of the Special Litigation Section, made the selection of Ms. Ryan.

On September 22, 1982, Ms. Machakos applied for a position as a Paralegal Specialist, GS–5/7/9, in the General Litigation Section of the CRD. The candidate selected was Ms. Jane Dyer (black). Ms. Dyer had been working in the General Litigation Section as a GS–8 Legal Technician since December 1979. Ms. Dyer was selected by the then-Deputy Chief of the General Litigation Section, Mr. Nathaniel Douglas (black), with advice from Luverta York (black), the Section's Paralegal Supervisor.

On March 2, 1983, Ms. Machakos applied for a position in the Voting Rights Section of the CRD as an EEO Specialist, GS–9, which had promotion potential to GS–11. Ms. Machakos made the "best qualified" list but was not selected.

The successful candidate for this position was Ms. Quilla James (black). Ms. James was one of several persons detailed to Section 5 of the Voting Section in 1982 to assist in meeting the demands of an excessive workload. No vacancy existed at the time the successful candidate's detail began in 1982. While on detail, Ms. James received training in the performance of EEO Specialist duties. Ms. James was encouraged specifically to apply for the position before the vacancy announcement was posted. Ms. James was selected by Ms. Margay Williams (black), Associate Director of the Section 5 Unit of the Voting Section.

On April 20, 1983, Ms. Machakos applied for a position as a Paralegal Specialist, GS–11, in the Criminal Section of the CRD. Ms. Machakos was informed that the position was cancelled because none of the candidates met three special requirements: freedom to travel extensively, good writing ability, and a college degree. The position announcement did not call for extensive travel nor did it list a college degree as a requirement. Ms. Kathleen Cooper Clark (white), then Supervisory Paralegal Specialist in the Criminal Section, testified that

upon review of the candidates, it was determined that none possessed the experience or background that the Criminal Section desired.

The Criminal Section had advertised the Paralegal Specialist position at the GS–11 level in hopes of luring an experienced paralegal who could assist with complex litigation anticipated in the near future. The fact that the vacancy notice failed to attract adequate candidates at the GS–11 level convinced the Criminal Section to cancel the announcement and seek Paralegal Specialists at a lower level. The Criminal Section then hired two Paralegal Specialists (both white) at the GS–5 level. In addition, the Criminal Section hired Ms. Jackie Evans (white), a lateral transfer from the CRD's Coordination and Review Section, as a GS–9 Paralegal Specialist.

Ms. Machakos alleges that in early 1984 she continued to apply, pursuant to vacancy announcements, to the Department for seven positions. Her complaint alleges that in each instance her application was rejected in favor of younger, black candidates. Third Amended Complaint, ¶ 27. Evidence adduced at trial showed that some of these applications were for positions outside the CRD; Ms. Machakos did not qualify for some positions; and, in at least one instance, the first person selected from the "best qualified" list was a white female over age 40.

Trial testimony indicated that Ms. Machakos and other applicants had written the wrong vacancy announcement designation on the application for one of these 1984 vacancies (advertised by an office outside the CRD). The mistake was an easy one to make, as the printed announcement made a capital "O" appear to be a capital "Q." Apparently, the selecting officials realized the error and considered some of the applicants for the vacancy, despite the improper vacancy designation. Ms. Machakos, however, who made the same mistake, was not considered for the position until after the position had closed.

Two of Ms. Machakos' 1984 applications were for vacant Equal Opportunity Specialist, GS–9, positions in Section 5 of the Voting Section of the CRD. The successful candidates were Ann Johnson (black) and Sara Smith (black), both of whom had been detailed previously to the Section 5 Unit.

Also in early 1984, the CRD caused a vacancy announcement to be posted for the position of Supervisory Records and Communications Management Specialist in the Administrative Management Section. The position was classified erroneously as a GS–12, but the announcement was withdrawn and posted again as a GS–11/12. Ms. Machakos was among the applicants for this vacancy but her name was not included in the list of candidates forwarded to the selecting officials, despite the fact that she was found eligible.

The successful applicant for this position was Diane Roberts (black). Ms. Roberts, previously a GS–10 Staff Assistant in the General Litigation Section of the CRD, had been detailed to this position in the Administrative Management Section. The selecting official was Mr. Daniel Mann (white), then Chief of the Administrative Management Section.

Defendants state that Ms. Machakos would have made the list of qualified candidates forwarded to the selecting official if she had submitted a copy of her current performance evaluation in a timely manner, along with her SF–171, as required. Ms. Machakos was tardy in submitting her appraisal due to the fact that she had appealed her rating. Ms. Machakos won the appeal, and the appraisal was changed. Further, the Court notes with interest the Department's rigid adherence to vacancy deadlines and application requirements in this instance, while willing to be more accommodating in other cases to black applicants. *See, e.g., supra* at 15.

Ms. Machakos was not permitted to work overtime on a 1985 project to clean up the file room, which is one part of the Correspondence Unit in which Ms. Machakos works. Ms. Diane Roberts (black), head of the Correspondence Unit, delegated responsibility for the file room project, including approval of those who could work over-

time, to Violet Randolph (black). Ms. Randolph denied Ms. Machakos' request to work overtime. Ms. Roberts testified that Ms. Randolph's reason for the refusal was Ms. Machakos' lack of expertise, though it is apparent to the Court that she did, indeed, have the experience necessary to work on the project. The four employees who did work on the project were all black. The outside Paralegal Specialist (black) used for the project was borrowed from the Voting Section allegedly because certain files required someone with expertise on the subject matter.

### B. *The Expert Testimony*

Mr. David C. Knudsen was accepted by the Court as an expert witness for plaintiff. He had worked previously in the Federal Government as a GS–12 Classification and Personnel Management Specialist in the Department of Agriculture and the former Department of Health, Education and Welfare. He later worked for the American Federation of Government Employees where he was responsible for processing appeals concerning classification actions. In 1980, Mr. Knudsen became a private consultant for attorneys, unions, and employees, providing services to federal employee unions concerning grievance preparation, affirmative action, and job classification and qualification issues.

While the Court did not find Mr. Knudsen's testimony unassailable on all points, particularly his technique for considering the qualifications of certain successful candidates, his conclusions that Ms. Machakos was well qualified for the positions that she applied for, are well taken. In addition to the experience that Ms. Machakos has gained, she has personally paid for and taken numerous legal assistant courses at George Washington University and Antioch Law School since 1978.

The defendants' Supervisory Personnel Management Specialist, Mr. John Rutland, did not provide testimony to rebut that of Mr. Knudsen. Principally, the Court is reluctant to give much weight to Mr. Rut-

land's conclusions, noting that he is employed by defendants.

### C. *The Dulmage/Mann Testimony*

Ms. Machakos filed complaints concerning her nonselection for positions in the CRD's Criminal and Voting Rights Sections. An internal, departmental EEO counselor, Ms. Claudia H. Dulmage was assigned in 1983 to conduct an investigation of Ms. Machakos' complaints. Ms. Dulmage served as an attorney in the Department's Antitrust Division, but also performed duties as an EEO counselor.

During the course of Ms. Dulmage's investigation, she interviewed several witnesses, one of whom was Mr. Daniel Mann, who was serving as an Executive Officer of the CRD. Mr. Mann testified that in 1983 he told Ms. Dulmage that "it probably was the case that there was an informal policy of promoting blacks within the Civil Rights Division." Tr. 446–47; *see also* Plaintiff's Exhibit No. 27 at 2. Ms. Dulmage testified that Mr. Mann stated that this practice had "been going on for some time and this policy of detailing people into jobs was one way of accomplishing that." Tr. at 11.

Upon completing her investigation of Ms. Machakos' complaint, Ms. Dulmage issued a report to Ms. Jane Redmon, the EEO Officer. In the report, Ms. Dulmage related Mr. Mann's statements "that the section Rita works in [the Correspondence Unit] is and has been a traditional dumping ground for malcontents, incompetents, etc. in the Division.... Mr. Mann also admitted that [Ms. Machakos'] skills are excellent, and that she is certainly one of the best workers in her group ('highly qualified'). He then said that her reputation has, in fact, preceded her. *I.e.*, supervisors know about her EEO case and probably avoid hiring her because of it." Plaintiff's Exhibit 27 at 2; *see also* Tr. at 11, 17.

To be sure, Mr. Mann testified that there had been no policy, formal or informal, of promoting blacks over equally qualified whites. Tr. at 437–38. The Court is not inclined to give much weight to Mr. Mann's exculpatory assertion. *See* Tr. at 447. Mr.

Mann still occupies a senior position in the CRD, and the motivation to make such a self-serving statement is apparent.

On the other hand, the Court is quite comfortable in relying on Ms. Dulmage's testimony. Ms. Dulmage's position outside the CRD and, at the time, as a volunteer EEO investigator, lends her the aura of a disinterested party, *i.e.*, one inherently more credible. *See also* Tr. at 13–14.

### D. *The Cumulative Impact*

To state the obvious, the facts of this case are complex. This case concerns not a single personnel action within a single time frame, but, rather, a series of personnel actions extending over a period of seven years.

The Court found no overt perversion of the promotion procedures by defendants. Yet, the Court cannot discount Ms. Machakos' numerous rejected promotion requests in light of Mr. Mann's and Ms. Dulmage's testimony. While it may be the case that Ms. Machakos was not the best qualified applicant in *every* instance, her experience, education, and performance record certainly made her well qualified for most of the positions that she sought.

Specifically, the Court finds that defendants pre-selected black candidates for promotion through covert and discriminatory use of the detailing practice. These candidates received preferential treatment because of their race, at the expense of Ms. Machakos' opportunity for advancement. Compounding this problem were Ms. Machakos' efforts to obtain relief by complaining and seeking EEO adjudication. *See, e.g.*, Plaintiff's exhibit 27 at 2 ("... supervisors know about her EEO case and probably avoid hiring her because of it.").

During the time surrounding the events of this litigation, it was defendants' policy to provide clerical personnel with opportunities to advance to the paralegal line of progression. Stipulated Fact No. 23, Appendix III to the Stipulated Facts. Defendants attempt to demonstrate statistically that the pool of clerical employees from which paralegals have been drawn has had

a racial proportion that explains the significant number of black paralegals. Again, the testimony of Mr. Mann and Ms. Dulmage renders this explanation inapposite, at best.

The Court emphasizes that its finding of reverse discrimination is based on the cumulation of Ms. Machakos' promotion rejections, colored by Mr. Mann's admissions and Ms. Dulmage's investigation.

### II. *Conclusions of Law*

Ms. Machakos seeks relief under Title VII and the ADEA. Essentially, Title VII prohibits an employer from considering an individual's race, color, religion, sex, or national origin in making any decision related to the compensation, terms and conditions, or privileges of employment. 42 U.S.C. § 2000e–2. The ADEA prohibits discrimination in the work place due solely to a person's age. 29 U.S.C. § 621. The Court has jurisdiction over this case pursuant to these statutes and 28 U.S.C. § 1331.

Ms. Machakos alleges that she has been subject to disparate treatment due to her race. Under the disparate treatment theory of discrimination, Ms. Machakos must show that her employer treated her less favorably because of race, sex, and/or age. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id.* at 335 n. 15, 97 S.Ct. at 1854 n. 15.

Ms. Machakos also claims that she has been subject to reprisal because she has filed complaints with the EEO. A party bringing a charge of unlawful reprisal under Title VII bears a burden of showing a causal relationship between the protected activity in which she has engaged and the subsequent adverse actions of her employers. *See McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984).

The configuration of Title VII litigation is by now well charted. Under *United States Postal Service Board of Governors*

*v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) *("Burdine"),* the plaintiff bears the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. *Burdine* at 253, 101 S.Ct. at 1093. The burden of establishing a *prima facie* case is not onerous. *Id.* at 253, 101 S.Ct. at 1093; *accord Ethnic Employees of the Library of Congress v. Boorstin,* 751 F.2d 1405, 1416 (D.C.Cir.1985); *see also Cuddy v. Carmen,* 762 F.2d 119, 122 (D.C.Cir. 1985) (The scheme for allocating evidentiary burdens under Title VII applies also to ADEA cases.)

■ In the context of a failure to promote, Ms. Machakos must show (1) that she belongs to a protected group, (2) that she was qualified for promotion, (3) that she was considered for and denied the promotion, and (4) that a similarly qualified employee from outside the protected group was promoted at the time that Ms. Machakos was denied promotion. *Bundy v. Jackson,* 641 F.2d 934, 957 (D.C.Cir.1981); *see generally Burdine,* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6 (model for *prima facie* case of discrimination in hiring set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is adaptable to varying factual situations).

■ By establishing a *prima facie* case, the Title VII plaintiff creates a "rebuttable presumption" of unlawful discrimination by an employer. *Aikens,* 460 U.S. at 714, 103 S.Ct. at 1481. (citations omitted). To rebut the presumption, the defendants must produce evidence that Ms. Machakos was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. If defendants do so, the presumption "drops from the case", *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10, and the ultimate factual issue—whether or not defendants discriminated intentionally against Ms. Machakos—is placed before the Court. *See Lanphear v. Prokop,* 703 F.2d 1311, 1314 (D.C.Cir.1983).

Throughout the proceedings "[t]he plaintiff retains the burden of persuasion.... She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095 (citation omitted). That is, the district court must decide which party's explanation of the employer's motivation it believes.

### A. The Race Claim

It is well settled that Title VII affords protection to whites, as well as minorities. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *accord Bishopp v. District of Columbia,* 788 F.2d 781, 786 (D.C. Cir.1986). In establishing the first element of the *prima facie* case in reverse discrimination cases, it is necessary for the white plaintiff to present some evidence of "background circumstances [that] support the suspicion that the defendant is the unusual employer who discriminates against the majority." *Lanphear v. Prokop,* 703 F.2d at 1315 (quoting *Parker v. Baltimore & O.R.R.,* 652 F.2d 1012, 1017 (D.C.Cir.1981)).

■ Ms. Machakos clears this first hurdle easily. The testimony of Mr. Mann and Ms. Dulmage, and Ms. Dulmage's report to Ms. Redmon, Plaintiff's Exhibit 27, amount to a strong affirmative case of improper discrimination. Courts weighing "background circumstances" have found that evidence of "irregular acts of favoritism" towards minority employees, racial disproportionality in promotions, and evidence of pressure within an agency to increase the percentage of minority employees will support a suspicion that an employer discriminates against white employees. *See Lanphear v. Prokop,* 703 F.2d at 1315; *Parker v. Baltimore & O.R.R.,* 652 F.2d at 1017.

■ The burden of producing evidence now shifts to defendants, which must articulate legitimate, nondiscriminatory reasons for rejecting Ms. Machakos or for prefer-

ring the individuals selected for the various position vacancies. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. Here, the defendants made a sufficient showing that in each case, promotion decisions were made based upon a systematic review of the candidates' qualifications. In some instances, defendants offered evidence to show that either Ms. Machakos missed the application deadline; that she submitted an incomplete application packet; that she was not the best qualified applicant; or that the position announcement was withdrawn. Further evidence included the December 13, 1982, decision by the EEOC, holding that there had been no discrimination or reprisal against Ms. Machakos concerning events complained of in 1977 and 1978. Joint Exhibit 1.

Each of these reasons for Ms. Machakos' rejection, or nonselection, for sought-after promotions, if true, is legitimate and nondiscriminatory. Accordingly, defendants have placed the burden on Ms. Machakos to "demonstrate by a preponderance of the evidence that the facially legitimate reason offered by the defendant[s] [were] not its true reason[s] but rather a pretext for discrimination." *Lanphear v. Prokop*, 703 F.2d at 1314. In this regard, Ms. Machakos carries her burden.

Again, the Court returns to the testimony of Mr. Mann and Ms. Dulmage. *See also* Plaintiff's Exhibit 27. Their testimony has persuaded the Court that a discriminatory animus likely motivated the defendants to subvert Ms. Machakos' efforts for promotion and that the proffered reasons for her nonselection in each instance are unworthy of credence. *See Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

■ The Court does not mean to suggest that in every instance Ms. Machakos was denied promotion for improper reasons. Indeed, it appears to the Court that in some instances Ms. Machakos was not the best qualified candidate or that she was not considered for a position due to her tardiness in applying. The Court, however, is incapable of viewing clearly the battlefield, for the smoke generated by the

Mann/Dulmage testimony hangs low, obscuring the particulars. Therefore, the Court must suspect strongly the defendants' discriminatory motive in each case, as it is unable to categorically disprove it in any one. *See International Brotherhood of Teamsters v. United States*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15.

■ Nor does the Court suggest that it relies solely on the testimony of Mr. Mann and Ms. Dulmage. Credible expert testimony was offered to demonstrate that Ms. Machakos was well qualified for the positions she sought. Yet, time and again a black person with demonstrably less experience than Ms. Machakos was chosen over Ms. Machakos. Further, the use of details to give black candidates a superficial boost smacked of pre-selection. Ms. Dulmage's testimony indicated this, and defendants' reliance on candidates' detail experience in making facially valid selections supports it.

It is true that an "employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability...." *Burdine*, 450 U.S. at 259, 101 S.Ct. at 1097 (citing *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n. 6 (1st Cir.1979)). In this case, the preponderance of the evidence leads the Court to conclude that the defendants frustrated Ms. Machakos' efforts for promotion in accorance with their "informal policy" of promoting systematically blacks over equally qualified whites. Accordingly, judgment will be entered for Ms. Machakos on her claim of race discrimination in her efforts to gain promotion in the CRD from 1977 to 1984.

### B. *The Reprisal Claim*

Title 42, United States Code, Section 2000e–3 proscribes specifically discrimination because of one's assertion of Title VII rights or because of one's participation in the EEO process. *See, e.g., Cooper v. Bell*, 628 F.2d 1208, 1211 (9th Cir.1980). The

order of proof set forth *supra* is applicable to claims of reprisal. *McKenna v. Weinberger,* 729 F.2d at 790; *supra* at 22–23.

■ The Court turns to Ms. Dulmage's testimony and her report to Ms. Redmon. In her report, Ms. Dulmage recounted her interview of Mr. Mann, "He then said that her reputation has, in fact, preceded her. *I.e.,* supervisors know about her EEO case and probably avoid hiring her because of it." Plaintiff's Exhibit 27 at 2. *See also* Tr. at 12.

Noting the credibility of this witness, the Court need not proceed further, particularly so in that defendants failed to rebut the implication of reprisal. *See Williams v. Boorstin,* 663 F.2d 109, 117 (D.C.Cir.1980) (Where plaintiff makes a showing of "pretext," defendant employer must then demonstrate by clear and convincing evidence that ultimate decision would remain unchanged, absent retaliation for plaintiff's participation in protected conduct.). The difficulty here, as with the race discrimination claim, is in pinpointing the causal connection between Ms. Machakos' engaging in statutorily protected activity and defendants' adverse personnel action. *See McKenna v. Weinberger,* 729 F.2d at 790. The Court concludes that such accuracy is unnecessary in this instance; the Mann/Dulmage testimony has poisoned the well, making all the drinking water suspect. The Court has before it sufficient evidence from which to infer that Ms. Machakos was discriminated against in promotion decisions because of her participation in the EEO process. *See* Plaintiff's Exhibit 27 at 2 (The Correspondence Unit is a "dumping ground for malcontents. . . ."). Accordingly, the Court finds for Ms. Machakos on her reprisal claim. 42 U.S.C. § 2000e–3.

## C. *The ADEA Claim*

The Title VII analysis articulated in *McDonnell Douglas Co' v.* and *Burdine* is generally applicable in ADEA cases. *Sutton v. Atlantic Richfield Co.,* 646 F.2d 407 (9th Cir.1981). To establish her *prima facie* case, Ms. Machakos "must demonstrate

facts sufficient to create a reasonable inference that age discrimination was 'a determining factor' in the employment decision." *Cuddy v. Carmen,* 694 F.2d 853, 856–57 (D.C.Cir.1982). An inference of discrimination is created if Ms. Machakos shows that she (1) belongs to the statutorily protected age group (40–70), (2) was qualified for the position, (3) was terminated, and (4) was disadvantaged in favor of a younger person. *Id.* at 857; *accord Krodel v. Young,* 748 F.2d 701, 706 (D.C.Cir. 1984).

■ Ms. Machakos has failed to carry her burden of persuasion and show by a preponderance of the evidence that age "made a difference" in the defendants' decisions. *Cuddy v. Carmen,* 694 F.2d at 857–58. While Ms. Machakos satisfied the first two elements necessary to indicate age discrimination, she was not terminated nor did she present any evidence that she was disadvantaged in favor of a younger person.

In contrast to her Title VII race discrimination claim, the Court can discern no evidence that age was "a determining factor" in the decisions to deny Ms. Machakos various promotions. *See Williams v. General Motors Corp.,* 656 F.2d 120, 130 (5th Cir. 1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982) ("[T]he evidence must lead the factfinder *reasonably* to conclude [that age discrimination occurred]." (Emphasis added). The evidence indicates that defendants were motivated to act upon racial differences, not age differences. Accordingly, the Court finds for the defendants on the ADEA claim.

## III. *Conclusion*

It is apparent that defendants had initiated and were pursuing an affirmative action plan to benefit minorities. The Court commends defendants on their worthwhile efforts to eliminate racial imbalances in the Department. While it is well settled that "Title VII does not prohibit such race-conscious affirmative action plans," *United Steelworkers v. Weber,* 443 U.S. 193, 197, 99 S.Ct. 2721, 2724, 61 L.Ed.2d 480 (1979),

the Supreme Court also observed that it was not "defin[ing] in detail the line of demarcation between permissible and impermissible affirmative action plans." *Id.* at 208, 99 S.Ct. at 2729. At the same time, it is plain that such laudable plans should not be permitted to "unnecessarily trammel the interests of ... white employees." *Id.*

Here, Ms. Machakos was a victim of discrimination due chiefly to the pre-selection of black candidates and reprisals for her participating in the EEO complaint process. The Court was presented not with a single instance of Ms. Machakos' nonselection for promotion, but with a series of events occurring over a seven-year period. Whether Ms. Machakos was the target of a systematic effort to deny her any advancement, or the random victim of a vigorous affirmative action plan, the Court cannot say. It is clear, however, that Ms. Machakos has been the victim of employment discrimination on account of her race, and, accordingly, she is entitled to relief. 42 U.S.C. §§ 2000e, *et seq.*

### IV. *Title VII Relief*

A finding of a violation of Title VII entitles presumptively the victim of discrimination to back pay and retroactive promotion. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 422, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). In accordance with this presumption of entitlement to back pay and retroactive promotion, Ms. Machakos should be awarded back pay and retroactive promotion *unless* the defendants can prove by clear and convincing evidence that she would not have been promoted even if there had been no discrimination. *Day v. Mathews*, 530 F.2d 1083, 1085 (D.C.Cir. 1976).

Defendants have presented no such mitigating evidence. To the contrary, Mr. Mann informed Ms. Dulmage that Ms. Machakos' performance "has routinely been very good; that she had superior ratings; that her work had never been criticized." Tr. at 12, 17; *see also* Plaintiff's Exhibit 8. Mr. Mann testified that he considered Ms. Machakos to be a very good performer. Tr. at 439. In addition, Mr. Michael L.

Espeut, who was Ms. Machakos' section chief from 1980 to 1983, testified that she "was a very good employee. She was a very good worker, very hard worker, very dependable, very capable .... a very good employee." Tr. at 276.

In 1976 when Ms. Machakos joined the CRD, she was told that though she was being hired as a GS–7, when funding became available she could be readily promoted to GS–9. *Supra* at 8; stipulated facts 5, 6; Tr. at 29–30. It was not until July 1981, however, that Ms. Machakos received a promotion to the GS–9 level. Tr. at 90. Presently, Ms. Machakos is a GS–9, step 6, Paralegal Specialist in the CRD. Tr. at 5.

Expert testimony indicated that in several instances, *viz.*, Jane Robinson, Vonnie Ryan, Jane Dyer, Quilla James, Ms. Machakos' qualifications were at least equal to those of the selectees. Tr. 217–227, 232–238. Further, in 1980–83 Ms. Machakos performed the same duties as the supervisor of the Correspondence Unit, Mr. Walker. At the time, Mr. Walker was a GS–12, though he was later replaced by Diane Roberts. Tr. at 97, 443–44; *see also* Plaintiff's Exhibit 27 at 2.

Prior to her selection, Mr. Mann had Diana Roberts detailed to the Correspondence Unit. Tr. at 438. Soon thereafter, the Department, through Mr. Mann, posted a vacancy announcement for supervisor of the Correspondence Unit. *Id.* at 432. The position was listed as a GS–11/12. Mr. Mann, as the selecting official, chose Ms. Roberts for this position. *Id.* at 435.

In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, the Court emphasized that the duty of the district court in determining a remedy once a victim has been identified, is to recreate the conditions and relationships that there would have been had there been no unlawful discrimination. *Id.* at 372, 97 S.Ct. at 1873. The Court observed that "[t]his process of recreating the post will necessarily involve a degree of approximation and imprecision." *Id.* This caveat is particularly appropriate in this case, where the discriminatory conduct was, perhaps, ill-defined, but no less palpable.

 Given the significance of Mr. Mann's statement indicating that there was an informal policy of promoting blacks over whites, the results of Ms. Dulmage's investigation concerning the discriminatory use of details; and Ms. Machakos' experience and accomplishment in the Correspondence Unit, the Court will award plaintiff a promotion to GS–11, step 6, retroactive to the date in 1984 when Ms. Roberts was selected over Ms. Machakos. *See* 42 U.S.C. § 2000e–5(g); *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 763, 96 S.Ct. 1251, 1263, 47 L.Ed.2d 444 (1976). Ms. Machakos is entitled to receive the difference between the salary that she would have received at the higher grade and her actual salary to the date of this opinion, including interest.

In addition, the Court enjoins defendants from acting against Ms. Machakos in retaliation for her pursuing this action. 42 U.S.C. § 2000e–5(g). The Court will award Ms. Machakos the costs of this action and her attorney fees incurred in pursuing her two successful claims. 42 U.S.C. § 2000e–5(k). The Court, however, will stay any such award of fees and costs pending the completion or waiver of any appeal. An order is attached.

### ORDER

This case was tried to the Court. For the reasons set forth in the accompanying opinion, it is by the Court this 3rd day of November 1986,

ORDERED that judgment is entered for plaintiff on her two Title VII claims; it is further

ORDERED that judgment is entered for defendants on the ADEA claim; it is further

ORDERED that judgment is entered for defendants on the Privacy Act claim; it is further

ORDERED that plaintiff's request for a nonsuit as to her Equal Pay Act claim is granted; it is further

ORDERED that plaintiff be promoted to GS–11, step 6, retroactive to the date in 1984 on which Ms. Diane Roberts was promoted to supervisor of the Correspondence Unit. 42 U.S.C. § 2000e–5(g); it is further

ORDERED that defendants pay backpay to plaintiff equal to the difference between the salary at the higher grade and her actual salary as of the date of this opinion and order, including interest. 42 U.S.C. § 2000e–5(g); it is further

ORDERED that defendants are enjoined from retaliating against plaintiff for pursuing her Title VII claims. 42 U.S.C. § 2000e–5(g); it is further

ORDERED that plaintiff be awarded her costs and attorney fees incurred in pursuing her two successful claims pending completion or waiver of any appeal. 42 U.S.C. § 2000e–5(k); and it is further

ORDERED that this case is dismissed.