Louis A. WHITTEN, Larry J. Warren, Alan T. Fenstemaker, and Carl A. Bonham, Plaintiffs,

v.

FARMLAND INDUSTRIES, INC., Defendant.

Civ. A. No. 88-2637-O.

United States District Court, D. Kansas.

March 19, 1991.

Dennis E Egan, Popham, Conway, Sweeny, Fremont & Bundschu, Kansas City, Mo., John B. Gage, II, Overland Park, Kan., for plaintiffs.

Edmund S. Gross, Prairie Village, Kan., Nancy M. Landis, Michaela M. Warden, William C Martucci, Spencr, Fane, Britt & Browne, Holly McCoy Zimmerman, Farmland Industries, Inc., Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter comes before the court on the summary judgment motion of defendant Farmland Industries, Inc. (hereinafter "Farmland"). The four plaintiffs allege various age discrimination and retaliation claims, pendent state law claims of breach of an implied employment contract and fraud, and a claim under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* More specifically, plaintiffs contend that their former employer discriminated against them on the basis of their ages when Farmland terminated their employment and failed to transfer or rehire them. They also claim that members of Farmland's management expressly promised them that they would not forfeit the rights and benefits they had acquired as members of the union if they accepted positions as supervisors. For the reasons stated below, the court will grant in part defendant's summary judgment motion.

## I. STATEMENT OF FACTS

Plaintiffs Louis Whitten (hereinafter "Whitten"), Larry Warren (hereinafter "Warren"), Alan Fenstemaker (hereinafter "Fenstemaker") and Carl Bonham (hereinafter "Bonham") are former employees of Farmland's plant in Lawrence, Kansas, who were terminated on December 30, 1986. Defendant contends that they were discharged pursuant to a reduction in force (hereinafter "RIF"), necessitated by reduced sales of fertilizer. Terminations were not limited to employees at defendant's facility in Lawrence. The December 30 RIF was the second phase of a reorganization in which a total of 1,100 employees in a work force of 7,100 were discharged. Fifty employees were initially terminated at defendant's facility in Lawrence, Kansas.[1]

Whitten began his employment at defendant's Lawrence plant in 1960. In November of 1975, he was promoted to labor pool foreman. In his capacity as foreman of the labor pool, plaintiff worked in every area of Farmland's Lawrence facility and became familiar with the acid, ammonia, and urea areas of the plant. Whitten states that William Hutton (hereinafter "Hutton"), a former maintenance superintendent, persuaded him to accept an offer in 1980 to become a maintenance foreman in the nitrate division. Hutton stated that foremen enjoy the same rights and benefits that union employees possess by virtue of their collective bargaining agreement.[2] Hutton, Burgen and others repeatedly advised Whitten over the course of ten years that "Farmland takes care of its supervision." Whitten's supervisor, Al Pavlicek (hereinafter "Pavlicek"), informed plaintiff that he would remain with Farmland until he retired. Whitten held the position of maintenance foreman until he was fired in 1986. He was fifty-one years old at the time of his termination.

---

1. Approximately thirty-one employees lost their positions as a result of the first phase in the RIF. A total of nineteen supervisory and administrative positions were eliminated at the Lawrence plant in the second phase of the RIF. Some of these employees later returned to employment.

2. More specifically, Hutton stated that Whitten's vacation, sick leave, life insurance, and retirement benefits would remain the same as they had been when plaintiff was a member of the union.

Warren began his employment with Farmland as a "checker" in defendant's Lawrence facility in 1953. He subsequently moved into the purchasing and warehouse department, where he held various positions until 1962. In 1962, Warren became a mechanic in the maintenance department. During his tenure as a mechanic, Warren worked primarily in the nitrate division. When he was offered a position as maintenance foreman in April of 1979, Warren was assured by Burgen that management "take[s] care of our own people." Burgen also promised Warren that his seniority with the Oil, Chemical and Atomic Workers International Union (hereinafter "the union") would be preserved if he accepted the position of foreman. Plaintiff says he was led to believe that he would be "moved back ... or transferred back into another job" in the case of a RIF. Warren now believes that Burgen lied because he could not convince any other union employees to take the job. He also thinks that the others who promised the company would protect him knowingly conveyed false information to him. Warren remained a foreman until December of 1986. He was fifty-one years old at the time of his discharge.

Fenstemaker began his employment with Farmland as a laborer at the Lawrence plant in 1958. In 1966, Fenstemaker became a mechanic in the maintenance division. He also worked in the ammonia section. Eleven years later, plaintiff accepted a promotion to foreman of the maintenance department. Fenstemaker initially rejected the offer for promotion, but accepted it after he was informed that salaried employees would "be the last to go" in the event of a plant shut-down. Fenstemaker was told by a supervisor, Bud Sutton (hereinafter "Sutton"), that he had "too much potential to remain an hourly worker" and he should "come over to the management side." Sutton and Hutton repeatedly assured Fenstemaker that "Farmland takes care of its salaried people." Plaintiff was assured his job security would be *as good or better* in management, compared to the hourly union ranks. Plaintiff worked as a foreman until he was discharged in December of 1986. Fenstemaker was forty-nine years old when he was terminated.

Plaintiff Bonham was hired by Farmland in September of 1963. He also began as a laborer in Lawrence. He was offered a foreman position in the nitrate section of the production department in December of 1976. When plaintiff asked how the "promotion" would affect his seniority rights, Harold Lewis, the nitrate superintendent at that time, informed Bonham that he "didn't have to worry about seniority." Lewis added that the company never laid off foremen and he didn't think they ever would lay them off. Fred Jacobson (hereinafter "Jacobson"), a supervisor in the nitrate plant, informed plaintiff sometime prior to 1983 that the company would find something for him in the event of a reduction in force. John Leak (hereinafter "Leak"), another Farmland employee, also stated that the company would take care of plaintiff in the event of a RIF. In 1983, Bonham was transferred to the urea section where he served as a foreman until the time in which defendant terminated his employment. Bonham was forty-four years old when he was discharged.

In August of 1986, John Harwell (hereinafter "Harwell"), defendant's vice president, advised George Haney (hereinafter "Haney"), the general manager of nitrogen operations at Farmland, that the number of employees in the nitrogen division would have to be reduced. Haney subsequently provided his plant managers with guidelines for the reduction in force. The guidelines instruct plant managers to "have a bias for expertise and proven loyalty." The guidelines state that those who are selecting which employees to terminate should "[k]eep in mind that long-term employees generally are more knowledgeable and more valuable employees." In addition, plant managers were advised that employees within the protected age group and those who have five or more years of experience should not be terminated unless there is a "good reason."

Haney determined that only six of the ten foremen at the Lawrence plant could be retained, but left the responsibility of se-

lecting the four who must be terminated to Donald Clark (hereinafter "Don Clark"), the plant superintendent, and Jerry Burgen (hereinafter "Burgen"), a maintenance supervisor. Burgen and Clark decided that John Swenson (age 46), Bill Gurley (age 47), Howard Bruce (age 54), Larry Mages (age 64), Marvin Bailey (age 59), and Don Engel (age 50) would be permitted to stay at Farmland. Engel was demoted from a supervisor's position to one of the remaining foreman positions. The job functions previously performed by Warren and Whitten were assigned to Engel. Defendant states that Swenson was retained because he had more experience. Plaintiffs point out that Swenson had only served as a supervisor when no one else was available. Plaintiff Whitten, by contrast, had long been a foreman. Whitten was equally qualified for the position awarded to Swenson, according to Don Clark.

The company determined that one of the foremen in the urea division must be discharged. Don Clark, with the assistance of William Jennings (hereinafter "Jennings"), the urea supervisor, and Roy Scherff (hereinafter "Scherff"), a former superintendent who had just been assigned to the urea division, decided to retain Ed Reid (age 39), J. Reusch (age 39), Jerry Rockers (age 45), and T. Wistuba (age 44), and discharge Bonham (age 44). Defendant states that Bonham was terminated because he had less experience in the urea area and was "somewhat ill-at-ease at supervising people." Reid was later transferred to the nitrate and acid sections of the plant. Reusch was moved to the nitrate section after the RIF.

The employees who were terminated pursuant to the second phase of the RIF were informed of their discharge at the company's front office on the morning of December 30, 1986. After announcing the discharges, Don Clark informed the group that they would be considered for recall or rehire. He added that they would be called back if Farmland's financial condition turned around and jobs opened up. Phyllis Reynolds testified that the men normally would be considered for rehire in the absence of a discharge for cause. When positions became available as a result of the

retirement or resignation of other employees, however, Farmland promoted younger employees to fill those vacancies. The company contends that the positions were filled pursuant to a management training program. Defendant's management and the union agreed to the training program in their collective bargaining agreement. Farmland states that the program provided union employees with an opportunity to obtain training, while the company was given the chance to observe an individual's work before it decided whether or not to extend an offer to join management.

Defendant states that five employees were promoted after participating in the management training program. Burgen and Clark allegedly considered plaintiffs for these promotions. On July 1, 1987, Steve Miller (hereinafter "Miller"), age 29, advanced to a senior foreman position in the ammonia division. Miller replaced George Redding (hereinafter "Redding") who, at age 59, decided to retire. Three months later Wayne Clark, age 56, was promoted to foreman of the maintenance department. Clark assumed a vacancy created by the retirement of Larry Mages. On May 1, 1989, Donald Chaney (hereinafter "Chaney"), age 50, was also awarded a position as maintenance foreman. Chaney succeeded Marvin Bailey, who had also retired. Richard Harrell (hereinafter "Harrell"), age 37, replaced Charlie Edmonds (hereinafter "Edmonds"), a production foreman, on September 15, 1989. One month later, John Ayler (hereinafter "Ayler"), age 39, was elevated to production foreman to fill a position vacated by Ernest Butell (hereinafter "Butell"), age 52, upon retirement. Plaintiffs claim there is no evidence that Ayler or Harrell participated in the training program. They add that Harrell's position had been previously performed by Bonham, who had more actual experience.

Defendant continued to hire and offer transfers, promotions, and other positions to new employees or younger employees with less seniority than plaintiffs. Jennings, age 54, was transferred to ammonia, acid, and utility sections, areas of the plant that were new to him. Gene Cosey (herein-

after "Cosey"), age 34, who was hired in February of 1985, and Jackson Wright (hereinafter "Wright"), age 53, who originally began working for Farmland in November of 1984, were rehired after being laid off pursuant to the first phase of the RIF. Howard Sheriff (hereinafter "Sheriff"), age 30, was also terminated pursuant to the reduction-in-force but rehired by Farmland in May of 1989. Defendant also offered to rehire William Hegeman (hereinafter "Hegeman"). In addition, Farmland transferred Richard Lind (hereinafter "Lind") to the Lawrence plant, and relocated James Witthaus (hereinafter "Witthaus") from Lawrence to the Pollock nitrogen plant.

Plaintiffs, through their representative, Michael Fisher (hereinafter "Fisher"), requested on at least three occasions that Farmland explain why they were terminated and other salaried foremen remained employed at the plant. Defendant's lawyer responded by accusing Fisher of "harassment" and described his inquiries as bordering on the "practice of law without a license." Three of the plaintiffs—Warren, Whitten, and Fenstemaker—filed applications for employment at Farmland's Lawrence facility. Whitten also submitted applications to defendant's offices in Dodge City, Kansas City, and Tampa, Florida. Plaintiffs believed that it was not necessary to formally apply for a job because they had already worked for the company over twenty years and Don Clark had advised them that they would be considered for recall or rehire. Fenstemaker, who was employed by Farmland for twenty-eight years, stated that members of defendant's management "know who I am, they know what kind of job I did, they know where I live, [and] they told me I was eligible for recall and rehire. That is all I ask. That is all I ever wanted."

## II. SUMMARY JUDGMENT STANDARDS

■ In considering a motion for summary judgment, the court must examine all the evidence in a light most favorable to the nonmoving party. *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n. 1 (10th Cir.1981). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Maughan v. S.W. Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir.1985). If the moving party does not bear the burden of proof, he must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This burden is met when the moving party identifies those portions of the record which demonstrate the absence of material fact. *Id.* at 323, 106 S.Ct. at 2552.

■ Once the moving party meets these requirements, the burden shifts to the party resisting the motion, who "must set forth *specific facts* showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (emphasis added). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleading." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511.[3]

## III. AGE DISCRIMINATION

■ The Age Discrimination in Employment Act (hereinafter "ADEA") prohibits an employer from discriminating against

---

**3.** *See* J. Cuellar, *The Age Discrimination and Employment Act: Handling the Element of Intent in Summary Judgment Motions,* 38 Emory L.J. 523, —— (1989) (under approach advocated by Chief Justice Rehnquist and Third Circuit, issues of intent, motive, and credibility should always be left to fact finder because such evidence can be weighed properly only if presented through live testimony); G. Busemeyer, *Summary Judgment and the ADEA Claimant: Problems and Patterns of Proof,* 21 Conn.L.Rev. 99, —— (1988) (weighing of opposing factual contentions and conflicting evidentiary inferences is not task of court faced with summary judgment motion; when plaintiff presents genuine issue of material fact in age discrimination case, ultimate question is for jury).

any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such individual's age. 29 U.S.C. § 623(a)(1). The purpose of the Act is to promote employment of older persons based on their ability rather than age, to prohibit arbitrary age discrimination in employment, and to help employers and workers find ways of meeting problems arising from the impact of age on employment. *Macellaro v. Goldman*, 643 F.2d 813, 815 (D.C.Cir.1980); *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 229 (11th Cir.1976). The ADEA is remedial and humanitarian legislation and should be liberally interpreted to effectuate the congressional purpose of ending age discrimination in employment. *Dartt v. Shell Oil Co.*, 539 F.2d 1256, 1260 (10th Cir.1976), *aff'd*, 434 U.S. 99, 98 S.Ct. 600, 54 L.Ed.2d 270 (1977); *Moses v. Falstaff Brewing Corp.*, 525 F.2d 92, 93–94 (8th Cir.1975), *appeal after remand*, 550 F.2d 1113 (8th Cir.1977).

▪ In order to establish age discrimination under the ADEA, 29 U.S.C. § 621 *et seq.*, a plaintiff must prove that age was a determining factor in defendant's treatment of him. *Perrell v. FinanceAmerica Corp.*, 726 F.2d 654, 656 (10th Cir.1984); *Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1181 (6th Cir.1983). Plaintiff need not prove that age was the *sole* reason for the employer's acts, but he must demonstrate that age "made the difference" in the employer's decision. *E.E.O.C. v. Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d 1166, 1170 (10th Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985); *Cancellier v. Federated Dep't Stores*, 672 F.2d 1312, 1316 (9th Cir.), *cert. denied*, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982).

▪ The framework and analysis developed in Title VII cases have been adapted and employed by the courts in age discrimination cases. *See, e.g., E.E.O.C. v. Sperry Corp.*, 852 F.2d 503, 507 (10th Cir. 1988); *Halsell v. Kimberly–Clark Corp.*, 683 F.2d 285, 289 (8th Cir.1982), *cert. denied*, 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983).[4] A disparate treatment claim under the ADEA may proceed in the following manner:

> The plaintiff first has the burden of establishing a prima facie case of employment discrimination under [the] standards set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the prima facie case is established, the defendant must articulate a reason, using admissible evidence, to explain why "the plaintiff was rejected, or someone else preferred, for a legitimate, nondiscriminatory reason." *Texas Dep't of Community Affairs*, 450 U.S. at 254, 101 S.Ct. at 1094. If such a reason is offered, in order to prevail the plaintiff must demonstrate that the defendant's articulated reason is a mere pretext for unlawful discrimination. *Id.* at 256, 101 S.Ct. at 1095. Throughout these stages, the overall burden of persuasion remains with the plaintiff. *Id.*

*Verniero v. Air Force Academy Sch. Dist. No. 20*, 705 F.2d 388, 391 (10th Cir.1983) (quoting *Burrus v. United Tel. Co. of Kansas, Inc.*, 683 F.2d 339, 340–41 (10th Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982)). While the *McDonnell Douglas* standards provide one method of establishing discrimination in employment under the ADEA, the criteria set out in *McDonnell Douglas* is merely a guideline and was not intended to be rigid, mechanized, ritualistic, or the exclusive method of proving a claim of age discrimination. *DeHues v. Western Elec. Co., Inc.*, 710 F.2d 1344, 1347 (8th Cir.1983); *Schwager v.*

---

**4.** The ADEA is a hybrid of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Fair Labor Standards Act of 1938 (hereinafter "FLSA"), 29 U.S.C. §§ 201 *et seq.;* its prohibitions are modeled after Title VII, while its remedies follow those of the FLSA. *See Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978) (ADEA's substantive prohibitions were derived *in haec verba* from Title VII); *see also* B. Schlei & P. Grossman, *Employment Discrimination Law* 504–05 (1976). Courts consequently turn to Title VII cases to interpret the ADEA's provisions. *See, e.g., Douglas v. Anderson*, 656 F.2d 528, 531–32 (9th Cir.1981); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1015–16 (1st Cir.1979).

*Sun Oil Co.,* 591 F.2d 58, 61 n. 1 (10th Cir.1979).

### A. Alleged Discriminatory Discharge on the Basis of Age

#### 1. Prima Facie Case

■ As noted above, the burden is initially upon a plaintiff to present a prima facie case by introducing evidence that he was adversely affected by defendant's employment decisions "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Community Affairs, supra,* 450 U.S. at 253, 101 S.Ct. at 1093. The term "prima facie case," as applied in ADEA cases, "means only that plaintiff has produced enough evidence to shift the burden of production to the defendant." *Ridenour v. Lawson Co.,* 791 F.2d 52, 55 (6th Cir.1986) (quoting *Halsell v. Kimberly–Clark Corp., supra,* 683 F.2d at 289–90).[5] Thus, a plaintiff creates a mandatory rebuttable presumption of actionable discrimination in his favor by presenting a prima facie case. *Id.* at 56 (citing *Texas Dep't of Community Affairs, supra,* 450 U.S. at 254, 101 S.Ct. at 1094).

■ A plaintiff establishes a prima facie case of age discrimination by showing that (1) he was within the age group protected by the ADEA; (2) he was adversely affected by the defendant's employment decision; (3) he was qualified for the positions at issue; and (4) he was replaced by a younger person. *Cooper v. Asplundh Tree Expert Co.,* 836 F.2d 1544, 1547 (10th Cir.1988); *Cockrell v. Boise Cascade Co.,* 781 F.2d 173, 177 (10th Cir.1986); *Eivens v. Adventist Health Sys.,* 660 F.Supp. 1255, 1258 (D.Kan.1988); *Brooks v. Trans World Airlines, Inc.,* 574 F.Supp. 805, 811 (D.Colo.1983).

■ In the context of a reduction-in-force (hereinafter "RIF"), an employer terminates employees, but the discharged employees are not replaced by new employees. Thus, the fourth element in the prima facie case of a discriminatory discharge cannot be satisfied. The discharged employee is usually unable to show actual replacement.[6] The Tenth Circuit has therefore modified the fourth prima facie element by requiring the plaintiff to "produc[e] evidence, circumstantial or direct, from which a fact finder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Branson v. Price River Coal Co.,* 853 F.2d 768, 771 (10th Cir.1988) (quoting *Williams v. Gen. Motors Corp.,* 656 F.2d 120, 129 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982)).[7] This element may be established "through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the reduction-in-force." *Lucas v. Dover Corp., Norris Div.,* 857

**5.** In *Burdine,* the Court stated:

The phrase "prima facie case" may denote not only the establishment of a legally mandatory, rebuttable presumption, but also may be used by the courts to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue. 9 J. Wigmore, *Evidence* § 2494 (3d ed.1940). *McDonnell Douglas* should have made it apparent that we use "prima facie case" in the former sense.

*Texas Dep't of Community Affairs, supra,* 450 U.S. at 250 n. 7, 101 S.Ct. at 1094 n. 7.

**6.** The plaintiff in a RIF case need not show that he or she was actually replaced by a younger employee. *Palmer v. United States,* 794 F.2d 534, 537 (9th Cir.1986); *Walker v. Mountain States Tel. & Tel. Co.,* 686 F.Supp. 269, 275 (D.Colo.1988).

**7.** All courts of appeal agree that some proof beyond the first three steps of the *McDonnell Douglas* formula is necessary to establish a prima facie case. The Fifth Circuit was the first court to modify the fourth element in the leading case of *Williams v. Gen. Motors Corp.,* 656 F.2d 120, 129 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). While several circuits, including the Tenth, have followed *Williams,* support has not been unanimous. In *Oxman v. WLS–TV,* 846 F.2d 448 (7th Cir.1988), the Seventh Circuit criticized the *Williams* decision as straying too far from the holding of *McDonnell Douglas. Id.* at 454. The *Oxman* court reasoned that the fourth element of *Williams* actually discards the *McDonnell Douglas* formula altogether because *McDonnell Douglas* does not require evidence of discriminatory intent. *Id.* at 454–55. The court held that a plaintiff could establish a prima facie case in a RIF situation by showing that (1) plaintiff was within the protected age group, (2) he or she was performing according to the employer's legitimate expectations, (3) plaintiff was fired, and (4) others not in the protected class were treated more favorably. *Id.* at 455.

F.2d 1397, 1400 (10th Cir.1988) (quoting *Branson v. Price River, supra,* 853 F.2d at 771).[8]

 Farmland concedes that plaintiffs were within the protected age group and acknowledges that plaintiffs were adversely affected by its decision to terminate their employment. Defendant likewise admits that plaintiffs were qualified for the positions they held at the time of their termination. The only remaining issue therefore is whether plaintiffs can present some evidence, gleaned from the circumstances of their discharges, which indicates that they were treated less favorably than younger employees. Warren and Whitten contend that they were replaced by Don Engel, an employee who was one year younger and had less overall experience. Fenstemaker claims that his position was given to John Swenson or Bill Gurley. Gurley and Swenson are three years younger than Fenstemaker. Fenstemaker had almost twelve more years of experience at Farmland than Swenson and over six more years of experience than Gurley. Bonham states that four younger foremen in his section remained employed and were transferred to other areas of the plant within one year of his termination. After viewing these facts in a light most favorable to plaintiffs, we have no trouble concluding that Bonham, Fenstemaker, Whitten, and Warren have established prima facie cases of discriminatory discharge on the basis of age.

### 2. *Legitimate, Nondiscriminatory Reason for Defendant's Actions*

 Defendant offers the RIF at Farmland as its legitimate, nondiscriminatory

reason for the termination of plaintiffs. The burden to articulate a reason requires defendant to do more than simply deny discriminatory intent or motivation; it must articulate a reason, legally sufficient to justify a judgment, and introduce credible, admissible evidence supporting the existence of the reason. *Horn v. Bibb County Comm'n,* 713 F.2d 689, 691 (11th Cir.1983); *Massarsky v. Gen. Motors Corp.,* 706 F.2d 111, 118 (3d Cir.1983). Defendant states that the RIF was necessitated by a downward economic trend in the fertilizer industry.[9] More specifically, Farmland states that Engel was preferred over Whitten and Warren for a job which combined the responsibilities of the two positions previously held by these two plaintiffs because Engel had more supervisory experience. Defendant adds that Bonham's position was awarded to Rockers because Rockers also had more supervisory experience. Farmland failed to offer a specific reason for preferring another employee over Fenstemaker.

### 3. *Pretext for Unlawful Discrimination*

 The existence of a RIF scenario does not insulate an employer's actions from the scrutiny of the ADEA. *Rosengarten v. J.C. Penney Co.,* 605 F.Supp. 154, 157 (E.D.N.Y.1985). A plaintiff employee has the opportunity to demonstrate that the defendant employer's stated reasons for discharging the employee were pretextual, and thus overcome the employer's defense. *Verniero v. Air Force Academy, supra,* 705 F.2d at 391. In the context of a reduction in force, the plaintiff is

---

**8.** The *Marquette University Law Review* provides further guidance:

[T]he fourth step in *Williams* can and should be interpreted to allow a broad range of evidence ... [T]he plaintiff is asked to probe the context of his adverse treatment for some additional evidence that will confirm the reasonableness of a mandatory presumption that the employer discriminated on the basis of age ... [T]his commends a trial for any plaintiff who has some evidence which, when considered along with his protected status, harm incurred and qualification for a remaining job, would reasonably warrant a presumption of discrimination.

R. Sholl & D. Strang, *Age Discrimination and the Modern Reduction in Force,* 69 Marq.L.Rev. 331, —— (1986); *see also* Comment, *The Prima Facie Case of Age Discrimination in Reduction in Force—A Flexible Standard,* 20 Tex.Tech.L.Rev. 841, —— (1989) (plaintiffs should not be kept from trial if they can make a showing which hints at discrimination).

**9.** The ADEA does not preclude a business from making cutbacks that are dictated by economic necessity; it does preclude, however, using age as a criterion in realizing that legitimate business goal. *Franci v. Avco Corp.,* 538 F.Supp. 250, 259 (D.Conn.1982).

not required to show the general reason for his or her discharge, but need only "raise a triable issue of pretext." *Montana v. First Fed. Sav. & Loan of Rochester,* 869 F.2d 100, 105 (2d Cir.1989).

Plaintiffs contend that Farmland's proffered reason—level of experience—is a mere pretext because younger foremen who remained at Farmland despite the RIF were transferred to positions in which they had no experience.[10] Jennings, for example, was transferred to the ammonia, acid and utility sections, areas of the plant that were new to him. Deposition of Jennings at 19 (Jan. 17, 1990). Plaintiffs point out that Whitten was familiar with all three of these areas. Deposition of Whitten at 91 (Jan. 1, 1990). They add that Bonham had previous experience in the urea section and Fenstemaker had worked in the ammonia section. Deposition of Bonham at 45 (Jan. 4, 1990); Deposition of Fenstemaker at 23 (Feb. 2, 1990).

Rockers, the employee preferred over Bonham, was moved to relief foreman for nitrate and warehouse supervisor, two areas where he had not previously worked.[11] Deposition of Donald Clark at 103–05 (Jan. 17, 1990). Bonham had twenty years of experience in the nitrate section. Deposition of Bonham at 39. Fenstemaker also had experience in nitrate, and Warren had worked in the warehouse. Deposition of Fenstemaker at 23; Deposition of Warren at 43–44 (Jan. 3, 1990). Reid, Reusch, and Westuba needed additional training after being transferred within one year of the RIF to areas of the plant in which plaintiffs had previous experience. Deposition of Clark at 103–06.[12] A lack of experience does not appear to have been an impediment to younger foremen who survived the RIF. We must conclude at this stage of the litigation that plaintiffs' evidence is sufficient to raise a triable issue of fact with respect to whether Farmland's stated reason for preferring younger employees over plaintiffs—plaintiffs' inexperience—is a mere pretext for age discrimination.

### B. Failure to Rehire
#### 1. Prima Facie Case

After the RIF in December of 1989, several foremen at the Lawrence plant were promoted as a result of resignations and the retirement of other Farmland employees. Steve Miller, who was twenty-nine years old, was elevated to senior foreman in the ammonia division in July of 1987. In May of 1989, Don Chaney, age 50, advanced to maintenance foreman. Rick Harrell, age 37, was upgraded to production

10. Where a discharged employee, in the protected age group, is better qualified for a position than younger employees who are retained, the fact finder is entitled to conclude that the articulated reasons are pretexts. *Thornbrough v. Columbus & Greenville R.R.,* 760 F.2d 633, 647 (5th Cir.1985). *See also Brooks v. Woodline Motor Freight, Inc.,* 852 F.2d 1061, 1063–64 (8th Cir. 1988) (employer's decision to discharge 57–year–old employee for poor job performance was pretextual where evidence indicated employee's business experience was superior); *Williams v. Edward Apffels Coffee Co.,* 792 F.2d 1482, 1486–87 (9th Cir.1986) (lack of experience of two persons hired and limited experience of two others raised question about whether employer's hiring decisions were pretextual); *Reed v. Signode Corp.,* 652 F.Supp. 129, 135 (D.Conn. 1986) (issue of fact as to whether employer's reason for not hiring ADEA claimant because he lacked marketing skills was pretextual and raised triable issue of fact in action where applicant had extensive sales and marketing experience); *Machakos v. Meese,* 647 F.Supp. 1253, 1263 (D.D.C.1986) (denial of plaintiff's applications for promotion were pretext for discrimination in view of promotion of person with de-

monstrably less experience). *See generally* R. Neal, *Age Discrimination and Reductions–in–Force,* 47 Ala.Law. 86, —— (1986).

11. Rockers was allegedly awarded Bonham's position because Rockers had more supervisory experience, but Scherff, one of the employees who decided to terminate Bonham, was unable to identify any specific incident to support his conclusion that plaintiff possessed inferior supervisory skills. There was also no indication from the testimony of Bonham's previous supervisors, Jennings and Comeau, that plaintiff was incapable of serving as a foreman.

12. Westuba was transferred to the ammonia and urea areas. Whitten had previous experience in both of these sections of the plant. Deposition of Whitten at 91. Bonham had been a foreman in the urea area. Deposition of Bonham at 37. Reid and Reusch were transferred to the nitrate section, an area of the plant in which Bonham had experience. Deposition of Bonham at 36. Reid was also moved to the acid area. Whitten also had experience in this part of the plant. Deposition of Whitten at 91.

foreman in September of 1989. In October 1989, John Ayler, who was then thirty-nine years old, was promoted to production foreman. Plaintiffs contend that Farmland's failure to rehire them as foremen when these positions became vacant constitutes age discrimination.

In order to establish a prima facie case of age discrimination in the failure-to-rehire context, a plaintiff must demonstrate: (1) he is a member of the protected group; (2) he is qualified and available for the rehire position; (3) he applied for the available position or can establish that the employer was otherwise obligated to consider him; and (4) the existence of evidence supporting the inference that he was denied the position because of his age. *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145 (6th Cir.1989); *Grabb v. Bendix Corp.*, 666 F.Supp. 1223, 1248–49 (N.D.Ind.1986). Defendant argues that plaintiffs were not qualified for the rehire positions and they failed to file formal applications; thus they were not rehired for legitimate, non-discriminatory reasons.

### 2. *Qualifications for the Rehire Positions*

Defendant asserts that Miller was promoted because he had previous experience as an operator in the ammonia division. Farmland claims that plaintiffs did not have the requisite experience to supervise the operation of that department of the plant. Plaintiffs note, however, that Miller did not have any experience as a supervisor. They add that plaintiff Bonham, by contrast, was a foreman in the ammonia/nitrate department from 1963 to 1966 and from 1967 to 1981. Donald Clark, defendant's plant superintendent, testified that Whitten, Warren, and Fenstemaker had work experience in the ammonia department.

Farmland contends that plaintiffs cannot contest the promotions of Chaney and Wayne Clark, because these two individuals were over forty years old and within the protected age class. The simple fact, however, that a position was awarded to a member of the protected age group does not bar a claim by plaintiffs under ADEA. *See, e.g., Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th Cir.1990) (failure to prove replacement by younger employee not fatal to ADEA claim); *Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230, 237 n. 5 (4th Cir.1982) (replacing employee with person outside of protected age group not essential legal element of ADEA claim); *Haydon v. Rand Corp.*, 605 F.2d 453, 454 n. 1 (9th Cir.1979) (per curiam) (replacement of plaintiff with older employee not fatal to action for age discrimination).

Defendant concedes that Bonham, having been foreman of the production department, was qualified for the positions assumed by Harrell and Ayler. Donald Clark testified in his deposition that Bonham possessed the experience required of the foreman of the production department. After carefully reviewing the facts in a light most favorable to the nonmoving party, we must conclude that plaintiffs have established their qualifications for at least one of the foreman positions for which they contend they should have been rehired by Farmland.

### 3. *Application Filing Requirements*

Defendant claims that plaintiffs' failure to formally apply for foreman positions at the Lawrence plant before 1989 precludes them from claiming that the positions were awarded on a discriminatory basis. Plaintiffs contend that there was no need to file applications because Farmland was aware of their desire to return to employment. Phyllis Reynolds, the plant's personnel administrator, stated that plaintiffs ordinarily, as a matter of policy, would have been considered for rehire. Defendant's plant superintendent, Donald Clark, testified that plaintiffs were eligible for recall or rehire. Jerry Burgen, Farmland's maintenance supervisor, added that plaintiffs were in fact considered for the foreman positions.

Where an employer considers candidates for promotion without asking for applications, the application requirement of a prima facie case is "loosened somewhat." *Wanger v. G.A. Gray Co.*, 872 F.2d at 146 (quoting *Box v. A & P Tea Co.*, 772 F.2d 1372, 1377 (7th Cir.1985),

*cert. denied,* 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986)). An ADEA plaintiff who fails to formally apply for a job opening may nonetheless establish a prima facie claim by showing that he would have applied had he known of the opening. *Id.; see also Moylan v. Nat'l Westminster Bank USA,* 687 F.Supp. 54, 58 (E.D.N.Y. 1988) (ADEA plaintiff's communication of desire for promotion to superior satisfied application requirement); *Taylor v. Battelle Columbus Laboratories,* 680 F.Supp. 1165, 1175 (S.D.Ohio 1988) (ADEA plaintiff "constructively applied" for job openings by meeting with review committee).[13] We have no trouble concluding at this stage of the case that plaintiffs Warren, Whitten, and Fenstemaker would have applied for positions as foremen had they been aware of such openings. Whitten submitted applications to Farmland offices in Kansas City, Dodge City, and Tampa, Florida, in 1987. In 1989, Warren expressed an interest in re-employment in a cover letter that he sent to defendant. Fenstemaker wrote a letter to defendant's personnel administrator at the Lawrence plant in 1989 asking to be notified if there were any openings.

 Bonham, however, never asked Farmland Industries to rehire him before the complaint in this case was filed. This plaintiff provided the following answers during his deposition:

Q. Did you ask whether or not you could be rehired?

A. No, I didn't.

Q. Did you ask any questions at all about going back to work for Farmland in any capacity?

A. I was in kind of a state of shock ... I didn't know what to ask ...

Q. So is your answer to my question "no", you asked no questions about going back to work for Farmland?

A. At the time, no, I didn't.

Q. Have you since that day applied for a job at Farmland?

A. No, I haven't.

Q. Have you ever called anyone [at Farmland] and told them you were interested or ... told them you wanted to go back to work there?

A. No, I haven't.

Deposition of Bonham at 73–74 (Jan. 4, 1990). Bonham added that another terminated employee led him to believe that he was "subject to recall." There is no indication that Bonham expressed any interest to defendant in returning to the Lawrence plant before this lawsuit was filed. The court will therefore grant Farmland's summary judgment motion as to Bonham's claim of failure to rehire.

### 4. *Management Training Program*

 Defendant offers its management training program as a legitimate, non-discriminatory reason for failing to ask plaintiffs to return when five foremen positions became vacant after the RIF. Farmland claims the company was obligated to promote union employees pursuant to the terms of an agreement between the company and the union to institute the training program. The agreement states that the purpose of the program is to permit "em-

---

**13.** The application requirement in Title VII cases has also been relaxed where an employer has an informal application procedure. Courts have generally held that the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie claim of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer. *See, e.g., Equal Employment Opportunity Comm'n v. Metal Serv. Co.,* 892 F.2d 341, 348–49 (3d Cir.1990) (application element of prima facie case relaxed where charging parties did everything reasonably possible to make interest in job known); *Hosley v. Armour & Co.,* 743 F.2d 199, 208–09 (4th Cir.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985) (casual inquiry into possibility of promotion constituted "appli-

cation" where employer actively discouraged black applicants); *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 568 (8th Cir.1982) (expression of general desire to advance sufficient for application where employer did not post vacancies), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983); *Chavez v. Tempe Union High School Dist.,* 565 F.2d 1087, 1092 (9th Cir. 1977) (plaintiff's discussion with principal constitutes "application" in light of informal application procedures); *Abrams v. Baylor College of Medicine,* 581 F.Supp. 1570, 1579 (S.D.Tex.1984) (plaintiff's informal communication to supervisors of desire to participate in career advancing program is enough for prima facie case where interest in program not communicated by formal application), *aff'd in part, rev'd in part on other grounds,* 805 F.2d 528 (5th Cir.1986).

ployees who desire to gain experience in supervision ... and also to give the Company an opportunity to evaluate qualifications of such employees." Plaintiffs contend that the training program is a pretext for replacing higher-paid, older employees with lower-paid, younger employees from the union.

Congress considered, but rejected, an exemption for management training programs when it enacted the ADEA. The House Report which accompanied the original bill stated:

> The committee declined to incorporate a specific exception for management training programs since it was believed *so broad an exemption in the law might open a very wide door of possible abuse.* Almost any training, or opportunity for acquiring experience on a job, might be construed as leading to future advancement to management positions.

H.R.Rep. No. 805, 90th Cong., 1st Sess. 4, *reprinted in* 1967 U.S.Code Cong. & Ad. News 2213, 2217 (emphasis added). Courts have generally held that programs which reduce costs by eliminating older employees who earn higher wages violates the ADEA. *See, e.g., Metz v. Transit Mix, Inc.,* 828 F.2d 1202, 1207 (7th Cir.1987) (cost-based employer practices having adverse impact on older workers undermine ADEA); *Leftwich v. Harris–Stowe State College,* 702 F.2d 686, 691 (8th Cir.1983) (selection plans that eliminate older workers with higher salaries violates ADEA); *Nemeth v. Clark Equip. Co.,* 677 F.Supp. 899, 910 n. 12 (W.D.Mich.1987) (replacing older work force with younger, lower-salaried employees to reduce labor costs constitutes impermissible age discrimination).

The language of the agreement in question does not require Farmland to hire foremen exclusively from the program.[14] George Haley, the Farmland general manager who signed the agreement on behalf of the company, testified that he was not aware of any reason that prevented the rehire of plaintiffs. Clark, the plant superintendent, likewise stated that there was no

reason he could not rehire or recall plaintiffs if they were qualified for a job opening. If Farmland was required to hire foremen exclusively from the training program, the defendant violated the agreement by offering to rehire Hegeman. Since the agreement to institute the training program is not even dated, we cannot be certain that it was made before the dates of the foreman openings. Further, the office correspondence announcing the promotion of union employees to foremen does not indicate that they participated in the training program. The court must conclude that plaintiffs have met their burden of demonstrating that there is a triable issue of fact with respect to whether Farmland's stated reason for failing to rehire them, compliance with its management training program, is a pretext for discrimination on the basis of age.

### C. *Failure to Transfer*
#### 1. *Prima Facie Case*

Plaintiffs allege that defendant discriminated against them on the basis of their ages by failing to transfer them to positions at other Farmland facilities. As noted above, the plaintiff in an ADEA case has the initial burden of establishing a prima facie case. *Texas Dep't of Community Affairs, supra,* 450 U.S. at 253, 101 S.Ct. at 1093; *Ridenour v. Lawson Co., supra,* 791 F.2d at 55. In order to prove a prima facie case based on the denial of a transfer, plaintiff must show that (1) the plaintiff was a member of the protected age group; (2) the plaintiff applied for a transfer but was not selected for that particular position; (3) the plaintiff was qualified for the transfer position that he sought; and (4) another person of similar qualification outside the protected age group was selected. *Barnes v. Southwest Forest Indus., Inc.,* 814 F.2d 607, 609 (11th Cir.1987); *E.E.O.C. v. Trans World Airlines, Inc.,* 544 F.Supp. 1187, 1218 (S.D.N.Y.1982).

There is no question that plaintiffs are within the protected age group, but only one plaintiff, Whitten, applied for positions at other Farmland facilities.

---

14. The decision as to whether to enter the program is left to the discretion of the employees. Employees are not guaranteed admission into the program. The company considers "craft qualification, leadership, ability, dependability *and seniority*" in determining whether to admit an applicant. Deposition Exhibit No. 14, ¶ 2 (emphasis added).

There is no indication that the remaining plaintiffs would have even applied for a position at defendant's other nitrogen manufacturing plants had they been aware of any such openings. A plaintiff cannot establish a prima facie case of failure to transfer on the basis of age discrimination, absent evidence that he or she applied for a transfer. *Douglas v. Pierce*, 707 F.Supp. 567, 571 (D.D.C.1988), *aff'd*, 906 F.2d 783 (D.C.Cir.1990); *Taylor v. Battelle Columbus Laboratories, supra*, 680 F.Supp. at 1175; *Reilly v. Friedman's Express, Inc.*, 556 F.Supp. 618, 625 (M.D.Pa.1983).

■ Further, plaintiffs have failed to prove that there were any openings at other plants, that they were qualified for those positions, and that those positions were awarded to persons of similar qualifications outside the protected age group. Farmland contends that the work force at the Lawrence plant, as well as at its other facilities, was reduced as a result of a severe economic downturn. Where an employer reduces its work force for economic reasons, the employer does not incur a duty to transfer employees to other positions within the company. *Ridenour v. Lawson Co., supra*, 791 F.2d at 57; *Sahadi v. Reynolds Chem.*, 636 F.2d 1116, 1117 (6th Cir.1980). Plaintiffs have not established a prima facie case, inasmuch as they never proved the existence of positions for which they were qualified at defendant's other plants. Moreover, even if we assumed that

plaintiffs established a prima facie case, there is no evidence that Farmland's actions, with regard to transfers, was pretextual or that plaintiffs were victims of discrimination. The court will grant defendant's summary judgment motion as to plaintiffs' claims of failure to transfer.

### D. *Allegations of Retaliation*

■ Plaintiffs allege that defendant retaliated against them after they requested information regarding the termination of their employment. Section 4(d) of the ADEA makes it "unlawful for an employer to discriminate against any of his employees ... because such individual ... has opposed any practice made unlawful" by the Act. 29 U.S.C. § 623(d).[15] The purpose of ADEA § 4(d) is to protect persons who " 'resort to the legal procedures Congress has established in order to right congressionally recognized wrongs.' " *E.E. O.C. v. Cosmair, Inc.*, 821 F.2d 1085, 1088 (5th Cir.1987) (quoting *East v. Romine, Inc.*, 518 F.2d 332, 340 (5th Cir.1975)); *Drez v. E.R. Squibb & Sons, Inc.*, 674 F.Supp. 1432, 1438 (D.Kan.1987) (quoting *Cosmair, supra*, 821 F.2d at 1088).[16] It "would be intolerable to punish an employee for invocation of the very act which is his protective armor." *Rogers v. McCall*, 488 F.Supp. 689, 697 (D.D.C.1980). In enacting the anti-retaliation provision of the ADEA, Congress sought to protect a wide range of activity in addition to the filing of a formal complaint. *Grant v. Hazelett Strip–Cast-*

---

**15.** ADEA § 4(d) contains two distinct clauses that protect employees and applicants for employment from retaliation. The "opposition clause" prohibits an employer from retaliating against such persons for opposing any practice made unlawful by ADEA § 4, 29 U.S.C. § 623. The "participation clause" makes it unlawful for an employer to discriminate against an individual "because such individual ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under the Act." ADEA § 4(d), 29 U.S.C. § 623(d).

Section 4(d) of the ADEA is derived from the anti-retaliation provision contained in § 704(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a); *see Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 755–56, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979) (ADEA was patterned after Title VII of Civil Rights Act and both statutes share common purpose, elimination of discrimination in work place). Section 15(a)(3)

of the Fair Labor Standards Act also contains an anti-retaliation provision which prohibits any person from discharging or in any other manner discriminating "against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the] Act." 29 U.S.C. § 215(a)(3).

**16.** An *employee* alleging his employer retaliated against him for engaging in protected activity is not required to establish discrimination as a condition precedent to recovery; the claimant need only have a reasonable belief that an unlawful employment practice was occurring in order to assert a claim of retaliation. *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir.1984); *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir.1983); *Marshall v. Pyramid Life Ins. Co.*, 1990 WL 58714, No. 89–2034–O, slip op. at 9–10 (D.Kan. Apr. 18, 1990); *Jonker v. Melvin Simon & Assoc., Inc.*, 1989 WL 31402, No. 86–1654, slip op. at 13 (D.Kan. Mar. 1, 1989).

*ing Corp.,* 880 F.2d 1564, 1569 (2d Cir. 1989).[17]

■■■■■ The three-step analysis adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), also applies to retaliation claims under the ADEA. *Lujan v. Walters,* 813 F.2d 1051, 1058 (10th Cir. 1987); *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1307 (10th Cir.1980). In order to establish a prima facie case of retaliation, plaintiff must demonstrate (1) he engaged in protected activity; (2) adverse action by the employer contemporaneously or subsequent to the employee's protected activity; and (3) a causal connection between such activity and the employer's action. *Anderson v. Phillips Petroleum Co.,* 861 F.2d 631, 634 (10th Cir.1988); *Harris v. First Nat'l Bank of Hutchinson, Kansas,* 680 F.Supp. 1489, 1493 (D.Kan.1987). A plaintiff may demonstrate the causal connection by producing evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. *Burrus v. United Tele. of Kansas,* 683 F.2d at 343.[18]

■■■■■ Plaintiffs contend Farmland retaliated against them after they requested through their representative, Fisher, that their former employer provide an "explanation ... regarding the selection process concerning the termination of salaried foremen from the Lawrence facility." [19] Plaintiffs asked defendant to furnish them with information regarding their terminations on at least three separate occasions. Defendant's lawyer responded by accusing Fisher of "harassment" and describing his inquiries as bordering on "practicing law without a license." Plaintiffs add that they were overlooked for a foreman vacancy shortly after their request for employment information. They believe that retaliatory animus played a role in awarding the position to Miller, a much younger employee who had less experience.

The defendant's behavior in this case is analogous to the retaliatory conduct alleged in *Wolf v. J.I. Case Co.,* 617 F.Supp. 858 (E.D.Wisc.1985). In *Wolf,* the defendant's alleged actions of retaliation included the failure to forward necessary employment information in a timely manner. The court recognized the plaintiff's claim and denied the defendant's motion to dismiss. *Id.* at 868. *See also Clemente v. United States,* 568 F.Supp. 1150, 1159–60 (C.D.Cal. 1983) (refusal to provide plaintiff with information regarding her performance constituted retaliation), *rev'd,* 766 F.2d 1358 (1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 881, 88 L.Ed.2d 917 (1986). Despite defendant's failure to provide the court with a legitimate, non-retaliatory reason for its failure to provide plaintiffs with the information they desired, the causal connection between the requests for information and Miller's promotion appears tenuous at best. We have grave reservations

---

**17.** *See, e.g., E.E.O.C. v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1012–14 (9th Cir.1983) (writing letter to customer of employer complaining about inadequacies in employer's affirmative action programs); *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1136–37 (5th Cir.1981) (boycotting and picketing of store), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982); *Coleman v. Wayne State Univ.,* 664 F.Supp. 1082, 1092 n. 5 (E.D.Mich. 1987) (stating repeatedly in public and private that university engaged in discriminatory employment practices).

**18.** The "causal connection" element of a retaliation action merely requires that plaintiff establish the protected activity and adverse action "were not wholly unrelated." *Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir.), *cert. denied,* 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985); *Sowers v. Kemira, Inc.,* 701 F.Supp. 809, 825 (S.D.Ga.1988). This causal link may be established by proof of change in an employer's conduct, proximity of an adverse employment decision to protected action, and an employer's efforts to conceal its conduct. *Jordan v. Wilson,* 649 F.Supp. 1038, 1061 (M.D.Ala.1986) (citing B. Schlei & P. Grossman, *Employment Discrimination Law,* Ch. 15 at 558–60).

**19.** As noted above, the ADEA is a remedial and humanitarian statute that should be interpreted liberally. *Dartt v. Shell Oil Co., supra,* 539 F.2d at 1260; *Moses v. Falstaff Brewing Corp., supra,* 525 U.S. at 93–94. In light of the fact that the underlying causes of retaliation can be subtle and often can be proved only through circumstantial evidence, we hold that plaintiffs' request for an explanation of their termination constitutes protected activity under the opposition clause of the anti-retaliation provision, ADEA § 4(d), 29 U.S.C. § 623(d).

**1540**

concerning the sufficiency of evidence in support of plaintiffs' claim of retaliation. The court will nonetheless deny defendant's motion for summary judgment on the retaliation claim out of an abundance of caution.

## IV. EMPLOYEE RETIREMENT INCOME SECURITY ACT CLAIMS

In Count II of plaintiffs' amended complaint, plaintiffs allege that defendant "substantially decreas[ed] retirement pension plan benefits to which plaintiffs otherwise would have been entitled, ... forcing the layoff and termination of plaintiffs." First Amended Complaint, ¶ 33 at 12. Plaintiffs add that they were fully vested in these benefits and contend that defendant violated section 510 of the Employee Retirement Income Security Act (hereinafter "ERISA"), 29 U.S.C. § 1140, by preventing them from obtaining the benefits they would have "acquired if allowed to be employed until retirement age." [20] *Id.* Farmland claims that plaintiffs have failed to produce any evidence that the RIF was motivated by defendant's intent to deny plaintiffs the accrual of additional employment benefits. In response to Farmland's defense, plaintiffs have decided not to pursue their ERISA claims. The court will therefore grant defendant's summary judgment motion as to plaintiffs' alleged violations of ERISA.

## V. BREACH OF CONTRACT CLAIM

In Count III of plaintiffs' amended complaint, plaintiffs allege that they were terminated in violation of an implied contract of employment. Plaintiffs contend that this contract was established through "a combination of methods," including "personnel policies and regulations, written communications, oral statements, express promises, conduct and established proce-

dures and practices." First Amended Complaint, ¶ 37 at 14. They add that these methods, taken together, demonstrate that the mutual expectations of both employer and employee constitute an integral part of each plaintiff's employment contract. *Id.* at 15.

Kansas has long adhered to the doctrine of employment-at-will. Under that doctrine, employment is terminable at the will of either the employer or employee, in the absence of an express or implied contract between the parties. *Mildfelt v. Lair,* 221 Kan. 557, 563, 561 P.2d 805, 811 (1977). *Lorson v. Falcon Coach, Inc.,* 214 Kan. 670, 679, 522 P.2d 449, 457 (1974). This court has previously held that the existence of an implied employment contract depends upon the factual circumstances of each particular case:

Where no definite term of employment is expressed, the duration of employment depends on the intention of the parties *as determined by circumstances in each particular case.* The understanding and intent of the parties is to be ascertained from the written or oral negotiations, the usages of business, the situation and object of the parties, the nature of the employment, and all the circumstances surrounding the transaction ...

*Kistler v. Life Care Centers of Am., Inc.,* 620 F.Supp. 1268, 1270 (D.Kan.1985) (emphasis added) (quoting *Johnson v. Nat'l Beef Packing Co.,* 220 Kan. 52, 54–55, 551 P.2d 779, 782 (1976)).[21] While the existence of an employee handbook or personnel manual may assist the court in ascertaining the intent of the parties, such a manual or handbook is only "one relevant circumstance for inferring an implied contract of employment in Kansas." *Jonker v. Melvin Simon & Assoc., Inc.,* 1989 WL 31402, No. 86–1654, slip op. at 9 (D.Kan. Mar. 1, 1989).

In the present case, plaintiffs were repeatedly assured by representatives of de-

**20.** ERISA § 510 is entitled "Interference with protected rights" and states in pertinent part: It shall be unlawful for any person to ... discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this title ... or the Welfare and Pension Plans Disclosure Act ... It shall be unlawful for any person to ... discriminate against any person because he has [partici-

pated] in any inquiry or proceeding relating to this Act.
29 U.S.C. § 1140. *See* T. Collingsworth, *ERISA Section 510—A Further Limitation on Arbitrary Discharges,* 10 Indus.Rel.L.J. 319, —— (1988) (courts should require employer to justify discharge of protected employee).

**21.** The Kansas Supreme Court originally quoted the above paragraph from the second edition of

fendant's management that "Farmland takes care of its supervisors." Whitten, for example, was informed by another supervisor, Pavlicek, that plaintiff would remain at Farmland until he retired. Burgen, Farmland's maintenance supervisor, and Jennings, defendant's urea supervisor, stated that the company had a long-standing policy of keeping supervisory personnel as long as they performed their jobs satisfactorily. Plaintiffs Bonham and Fenstemaker added that they could not recall any member of management being laid off in the past twenty years.

Plaintiffs also assert that they were expressly promised that they would enjoy the same rights and benefits that union employees obtained in their collective bargaining agreement with Farmland.[22] Whitten was advised by defendant's former maintenance superintendent, Hutton, that he would retain his seniority rights. Hutton added that Whitten's vacation, sick leave, life insurance, and retirement benefits would remain the same as a supervisor as they had been when plaintiff was a member of the union. Engel, a supervisor at the Lawrence plant, was also informed by Hutton and Hoffman, the plant manager, that he would keep the benefits and seniority that he acquired as a union employee. Plaintiff Fenstemaker was informed that his job security would remain as good or better in management than it had been as a member of the union.

We have previously held that "longevity of plaintiff[s'] employment with defendant" is an important consideration in determining whether an implied contract of employment existed. *See Kistler v. Life Care Centers, supra,* 620 F.Supp. at 1270 (citing

*Allegri v. Providence–St. Margaret Health Center,* 9 Kan.App.2d 659, 684 P.2d 1031 (1984)). In the instant action, all four plaintiffs were employed by Farmland for over twenty years, and three plaintiffs worked for the company in excess of twenty-five years. The circumstances surrounding plaintiffs' employment therefore acquired more meaning and definition over time than the relationship between most employers and employees. The oral representations made by members of Farmland's management were corroborated by the company's actions over the course of many years.

The most compelling evidence of an implied contract of employment is contained in defendant's office correspondence. A memorandum from Phil Johnson to Farmland management staffs explains defendant's "procedures for terminations which may result from Phase II restructuring." (Def. App. F, Exh. 2). The memo instructs staff members to "have a bias for expertise and proven loyalty." *Id.* Johnson adds that they should "[k]eep in mind that long-term employees generally are more knowledgeable and more valuable employees." *Id.* He states that employees within the protected age group and those who have five or more years of experience should not be terminated unless there is a "good reason." *Id.* These procedures are consistent with the oral assurances that plaintiffs received from management over the many years of their employment with Farmland. We believe that defendant's desire to retain long-term employees, as expressed through office correspondence and members of management, combined with the absence of

---

American Jurisprudence. See 53 Am.Jur.2d, Master and Servant § 27 at 103 (1970). This language was cited with approval by the Court in *Morriss v. Coleman Co.,* 241 Kan. 501, 510, 738 P.2d 841, 847 (1987) and by the Kansas Court of Appeals in *Allegre v. Providence–St. Margaret Health Center,* 9 Kan.App.2d 659, 663, 684 P.2d 1031, 1035 (1984). *See also Derstein v. Benson,* 714 F.Supp. 481, 493 (D.Kan.1989) (quoting *Johnson, supra,* 220 Kan. at 54–55, 551 P.2d at 782) (existence of implied employment contract depends upon factual circumstances of each particular case), *modified,* 747 F.Supp. 1414 (D.Kan.1989).

**22.** Defendant contends that the court must find as a matter of law that plaintiffs were terminat-

ed for "good cause" because they were discharged as a result of a reduction in force. We disagree. Defendant's personnel director, Reynolds, testified that plaintiffs were not terminated for cause, and, therefore, were eligible for re-hire. "Good cause" based on a RIF is not at issue here. Plaintiff's claims of implied contract are premised upon express promises from Farmland that the rights and benefits they acquired as members of Local 5–613 of the Oil, Chemical and Atomic Workers International Union would have protected them from the RIF and that other employees with less seniority and experience would have been discharged in their place.

previous lay-offs of supervisory personnel and the longevity of plaintiffs' employment with Farmland, create genuine issues of material fact which preclude summary judgment on plaintiffs' claims for breach of an implied contract of employment.

## VI. FRAUDULENT MISREPRESENTATION

■ In Count IV of the amended complaint, plaintiffs allege that at the time they were promoted to foremen, and "at various times up to and including" December 30, 1986, defendant made knowingly false statements to plaintiffs to the effect that their seniority and years of service with the company entitled them to job security if economic events ever forced lay-offs. First Amended Complaint, ¶ 44 at 17. Plaintiffs also claim they were informed that transfers within the company would be determined on the basis of established policies, which included performance, skills, merit, and seniority. *Id.* They add that they relied on these representations which "were knowingly false when made, or were made by defendant with reckless disregard for their truth or falsity." *Id.* at 18.

■ The elements of fraud are well established. Plaintiffs must show: (1) an untrue statement of material fact; (2) known to be untrue by the person making it; (3) made with an intent to deceive or recklessly made with disregard for its truthfulness; and (4) the justifiable reliance of another party on the statement's truthfulness and injury as a result of said reliance. *Slaymaker v. Westgate State Bank*, 241 Kan. 525, 531, 739 P.2d 444, 450 (1987); *Scott v. Strickland*, 10 Kan.App.2d 14, 19–20, 691 P.2d 45, 51 (1984). The injured party's reliance on a fraudulent misrepresentation "must be reasonable, justifiable and detrimental." *Hutchinson Travel Agency, Inc. v. McGregor*, 10 Kan. App.2d 461, 464, 701 P.2d 977, 980, *rev. denied*, 238 Kan. 877 (1985).

■ Ordinarily, fraudulent misrepresentations, to constitute fraud, must relate to some material past or existing fact, as opposed to actions in the future which might or might not occur. *Hawthorn–Melody, Inc. v. Driessen*, 213 Kan. 791, 796, 518 P.2d 446, 451 (1974); *Dreiling v. Home State Life Ins. Co.*, 213 Kan. 137, 143, 515 P.2d 757, 764 (1973). Where a claim of fraud is predicated on a promise or statement concerning future events, there must be more than mere nonperformance to show fraudulent intent. *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 78, 596 P.2d 816, 824 (1979). The gravamen of such a claim is the existence of other circumstances of substantial character which support an inference of wrongful intent at the time of making the representation. *Young. v. Hecht*, 3 Kan. App.2d 510, 515, 597 P.2d 682, 688 (1979).

In support of their claim of fraudulent misrepresentation, plaintiffs rely on statements from members of Farmland's management. Plaintiffs say they were assured that if they accepted the foreman positions they would be protected by the rights and benefits they acquired as members of the union, in the event that economic conditions forced cutbacks. Plaintiffs add that they repeatedly were reminded that "Farmland takes care of its supervisory personnel." Even if the court assumes for the purpose of plaintiffs' claim of fraudulent misrepresentation that these statements were in fact made, plaintiffs relied on them and that they were untrue, there is no indication that the declarants knew the statements were false. Further, there is no evidence to suggest that the statements were made with a wrongful intent to deceive or recklessly made with disregard for their truthfulness. The court will grant Farmland's summary judgment motion as to plaintiffs' claim of fraudulent misrepresentation.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment is hereby granted as to plaintiffs' claims premised on violation of ERISA, fraudulent misrepresentation, and Farmland's failure to transfer.

IT IS FURTHER ORDERED that defendant's summary judgment motion as to plaintiff Bonham's claim of failure to rehire is granted.

IT IS FURTHER ORDERED that defendant's summary judgment motion is denied in all other respects.